**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07-CR-540 CAS |
| | ) | |
| SALLY ANN HODGE, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT
AND CONCLUSIONS OF LAW CONCERNING
LOSS AND RESTITUTION AMOUNTS**

This matter came before the Court for sentencing of defendant Sally Ann Hodge on August 20, 2008. In accordance with rulings announced from the bench, the Court issues its findings of fact and conclusions of law concerning loss and restitution amounts.

**Defendant's Objections to Loss Amount**

Defendant Sally Hodge objects to paragraphs 11, 12, 13, 16, and 21 of the pre-sentence investigation report (PSR), which state in relevant part that the amount of the loss is between $200,000 and $400,000. Hodge argues that the actual loss is no more than $2000, and only if the government can establish that she was paid $100 for each of the twenty (20) false claims that were included in the written stipulation of facts. In support of her argument, defendant contends that the government has used a flawed "representative sampling" methodology in determining the amount of the loss. Further, she asserts that she is not legally responsible for all the acts the government attributes to her or the loss of $236,297.70.

**Legal Standard at Sentencing**

The Eighth Circuit has repeatedly held that the preponderance of evidence standard is to be used in sentencing hearings. In United States v. Thorpe, the Court stated: "Judicial fact-finding based upon a preponderance of the evidence standard is permitted in sentencing provided that the guidelines are applied in an advisory manner." 447 F.3d 565, 569 (8th Cir. 2006) (citing United States v. Booker, 543 U.S. 220, 266-67 (2005)); see also United States v. Pirani, 406 F.3d 543, 552 n.4 (8th Cir.)(en banc), cert. denied, 546 U.S. 909 (2005).

**Definition of Relevant Conduct**

Section 1B1.3(a)(1) of the Sentencing Guidelines defines relevant conduct attributable to a defendant for sentencing purposes. This section states that a defendant is liable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . ." Id. Section 1B1.3(a)(2) allows the district court to consider all acts and omissions constituting "the same course of conduct or common scheme or plan as the offense of conviction." Therefore, the district court should consider the "'similarity, regularity, and temporal proximity' of the conduct in determining whether it is part of the same course of conduct or common scheme or plan." United States v. Anderson, 243 F.3d 478, 485 (8th Cir. 2001) (citations omitted). "Common scheme or plan" as used in § 1B1.3(a)(2) is broadly construed in determining relevant conduct. United States v. Berry, 212 F.3d 391, 393 (8th Cir. 2000). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." United States v. Sheahan, 31 F.3d 595, 599 (8th Cir. 1994) (citing U.S.S.G. § 1B1.3, application note 9).

The burden is on the government to prove the loss attributable to the defendant. "The district court's method for calculating the amount of loss must be reasonable, but the loss 'need not be determined with precision.'" U.S. v. McIntosh, 492 F.3d 956, 961 (8th Cir. 2007). The district court need only make a reasonable estimate of the loss, given the available information.

**Findings of Fact**

The Court makes the following findings of fact, based on the evidence adduced at the sentencing hearing on June 12, 2008. The Court finds the witnesses' testimony concerning the facts outlined below to be credible.

*Defendant Submitted 1762 Reimbursement Claims to Paramed Solutions*

Jacqueline Coleman, the owner of Paramed, testified that defendant Hodge was an independent contractor of Paramed. Transcript of June 12, 2008 Sentencing Hearing (hereafter Tr.). Paramed hired independent contractors, who conducted paramedical examinations of insurance applicants. Tr. at 9, ll. 23-25 to 10, ll. 1-17. The independent contractors were paid by Paramed, which in turn was paid by the Health Masters, Examination Management Services, Inc., and Hooper Holmes, the billing companies that Paramed used. Plea Agreement, Guidelines, Recommendations and Stipulations (Plea Agreement) at 7-8, ¶¶ 4c and 4i.

Ms. Coleman further testified that the defendant was given access to the Paramed website and given a unique password and login name for her use on the Paramed website. Tr. at 11, ll. 14-25; at 13, ll. 18-21. Plea Agreement at. 8, ¶ 4e. Ms. Coleman identified Government Exhibit 1 as an e-mail that the defendant submitted to Paramed and further stated that the defendant always used e-mail to submit her reimbursement claims. Tr. at 12, ll. 1-17.

Government Exhibit 1 reflected that the e-mail was from "Sally165@netzero.com." FBI Special Agent David Herr testified that documents obtained from the internet provider NetZero indicated that the NetZero e-mail address assigned to the defendant was sally165@netzero.com. Tr. at 55, ll. 7-16.

The subject line of Government Exhibit 1, the e-mail from the defendant to Paramed, reads: "http://www.paramedsolutions.com/billexams.php." The e-mail also contained an insurance applicant's name, date of birth, Social Security account number, address, the insurance agent's name and code, the name of the insurance company that the applicant was applying to, and the clinical laboratory where specimens were sent for testing. Tr. at 14-16.

Ms. Coleman further testified that she submitted bills for the examinations, purportedly provided by the defendant, to the paramedical companies that Paramed used and these paramedical companies in turn billed American National Insurance (ANI). Tr. at 23, ll. 10-18.

The defendant knew that Paramed submitted bills through other paramedical companies, such as Portamedic, because Ms. Coleman encouraged the defendant to use Portamedic for the reason that it paid more. The defendant also listed on the reimbursement claims the name of the insurance company, ANI, and the paramedical company that would bill to ANI. Gov't. Ex. 1. Tr. at 22, ll. 24-25 to 23, ll. 1-7.

<u>*Defendant's Reimbursement Claims Were False*</u>

Ms. Coleman testified that paramedical examiners are required to submit to the insurance company a copy of the paramedical report, a lab slip, and the EKG findings. Tr. at 16, ll. 19-23. However, the defendant did not submit any documents reflecting the examinations to ANI for any of the 1762 applicants identified in the reimbursement claims.

ANI was the insurance company that the defendant selected and listed in the 1762 reimbursement claims. Defendant had to type the home office address of ANI, located in Galveston, Texas, on each of her reimbursement claims. Tr. at 15, ll. 1-10. Therefore, defendant knew that ANI would be billed for the paramedical examinations reflected in her reimbursement claims.

Special Agent Herr testified that he interviewed George Marchand, who was formerly employed at ANI. Mr. Marchand had discovered through an audit or quality control process that ANI had paid for 1762 examinations for which there was no corresponding insurance applications. Mr. Marchand searched two ANI databases and found no records related to these 1762 examinations or applicants in the databases. The first database searched was the master database which contained information on all ANI life insurance customers. The second smaller database contained insurance applications that were being processed, but had not been approved. Tr. at 56, ll. 1-25 to 57, ll. 1-5.

After Paramed received notice from Hooper Holmes that 1762 reimbursement claims were not valid, Paramed determined that the defendant had submitted all the reimbursement claims. Tr. at 17, ll. 14-25. Despite receiving a request from Paramed, the defendant never submitted any documents reflecting her examinations of any of the 1762 persons identified in her reimbursement claims. Tr. at 18, ll. 2-18. Paramed examined about 50 of the defendant's reimbursement claims and concluded that the claims contained false information. Tr. at 23, l. 25 to 24, ll. 1-7.

As part of his investigation, Special Agent Herr also attempted to determine if the 1762 applicants listed in the defendant's reimbursement claims actually existed. Prior to the indictment in this case, he determined that the twenty applicants listed in the indictment did not exist. Prior to the June 2008 sentencing hearing, Special Agent Herr randomly selected another 100 applicants listed in the defendant's e-mails and searched several federal and state law enforcement databases, the Missouri

5

Department of Revenue records and the Social Security Administration records. He determined that the 120 applicants did not exist. Tr. at 57, ll. 17-25 to 59, ll. 1-11.

Moreover, Paramed, ANI, and the FBI independently concluded that the insurance agents listed in the defendant's reimbursement claims either did not exist, did not know the defendant, or were not registered agents of ANI. Ms. Coleman testified that Paramed did not refer applicants to the defendant. Rather, insurance agents referred applicants to the defendant and the defendant would identify the agent and insurance company in her reimbursement claims. Tr. at 10, ll. 18-23. Ms. Coleman examined the names of the insurance agents and was able to determine that two of the eight actually existed. The two insurance agents stated that they had never heard of the defendant. Tr. at 18, ll. 14-23.

Special Agent Herr also conducted his own search for these eight insurance agents. Like Paramed, he was only able to locate two of the eight agents listed in the defendant's reimbursement claims. Both insurance agents stated that they did not refer any applicants to the defendant and did not know her or the twenty applicants in the indictment. One of the insurance agents thought that the defendant might have conducted his paramedical examination when he applied for life insurance. Tr. at 73, ll. 14-25 to 74, ll. 1-14.

Special Agent Herr testified that he interviewed an ANI auditor, who indicated that six of the eight agents listed on the defendant's reimbursement claims were not agents of ANI. Tr. at 57, ll. 6-16, at 72, ll. 11- 25 to 73, ll. 1-5.

Paramed attempted to determine if the defendant had actually sent specimens to Clinical Reference Laboratory (CRL) and asked CRL to review certain records. Tr. at 27, ll. 5-16. Cynthia Hicks, vice president and corporate treasurer and secretary of CRL, testified that she was unable to

6

locate any record of 253 applicants purportedly examined by the defendant. Paramed gave CRL a list of 253 applicants, who were identified in the defendant's reimbursement claims as having specimens taken and sent to CRL. The list contained the name, the date of birth, Social Security number, and the bar code number from the laboratory form. The laboratory form, with the preprinted bar code, is submitted to the laboratory with any specimens to be tested. Tr. at 31, ll. 11-25 to 32, ll. 1-23.

CRL first searched by bar code number and found that the eight digit number bar code number did not match CRL's ten digit bar code, which began with "80." CRL added the "80" before the bar codes on the list and then conducted the search. No record was found for the 253 bar codes and associated specimens. Tr. at 32, ll. 23-25 to 33, ll. 1-22.

CRL then searched by name, Social Security number and date of birth, and still found no record that any specimens had been received. Tr. at 33, ll. 13-22. Finally, CRL conducted a search within a two week period and still found nothing. Id.

Ms. Coleman did not send bar codes to other laboratories after receiving the results of the search by CRL. She determined that the bar codes used by the defendant did not match those used by the other laboratories that Paramed used. Tr. at 27, ll. 20-25 to 28, ll. 1-7.

*Loss Amounts Sustained by the Paramedical Companies*

Luci Stoll, vice president of Portamedic, testified that Hooper Holmes suffered a loss of $100,579 as a result of the fraudulent reimbursement claims submitted by the defendant. Portamedic is the paramedical division of Hooper Holmes and conducts paramedical examinations and also bills insurance companies for paramedical examinations performed by other paramedical companies. Tr. at 37, ll. 10-24 to 38, ll. 1-20. For approximately a year, Portamedic submitted bills to ANI for paramedical examinations performed by Paramed examiners. Tr. at 38, ll. 18-20. As a result of the

7

false claims submitted by the defendant, ANI charged back all the payments that ANI had made to Hooper Holmes for the examinations purportedly provided by the defendant. Hooper Holmes sustained a loss of $100,579, which is the amount Hooper Holmes had to re-pay ANI for the defendant's false reimbursement claims. Tr. at 39, ll. 1-17.

Kim Anderson, the vice president of Examination Management Services, Inc. (EMSI), testified that EMSI was one of a few entities that were approved to submit invoices for paramedical examinations directly to insurance companies. Tr. at 43, ll. 1-7; at 44, ll. 2- 9. EMSI had a contract with Health Masters to submit bills to insurance companies for paramedical examinations performed by Health Masters and other paramedical companies. Tr. at 43, ll. 15-17.

After being notified that EMSI had submitted billing for services that were not legitimate, EMSI did a brief investigation and immediately refunded $140,718.70 that ANI had paid for the reimbursement claims. Then EMSI recovered $120,270.15 from Health Masters, whom EMSI had paid. EMSI suffered a loss of $15,448.55, which represents the amount that EMSI was unable to recover from Health Masters. Tr. at 44, ll. 16-25 to 45, ll. 1-25.

Steven Libby, the president of Health Masters, confirmed that Health Masters suffered a loss of $120,270.15 as a result of the reimbursement claims of the defendant. Health Masters performs life insurance examinations and also bills for paramedical examinations performed by other paramedical examiners. Health Masters had a contract with EMSI and submitted bills to EMSI for paramedical examinations that Paramed examiners performed. Neither Paramed nor Health Masters were approved to submit claims directly to ANI. Tr. at 51, ll. 3-25 to 52, ll. 1-16. After being informed of the defendant's false reimbursement claims, Health Masters repaid EMSI $120,270.15. Tr. at 53, ll. 8-12.

8

Paramed did not suffer any out of pocket financial losses, but was negatively affected by the false reimbursement claims submitted by the defendant. Paramed is no longer able to bill directly through EMSI or Hooper Holmes. Paramed has to bill exclusively through Health Masters and is paid less for the examinations. As a result, Paramed suffered a loss of revenue as well as a loss of current and potential customers. Tr. at 20, ll. 9-22. Because Paramed's loss is a future loss and cannot be reasonably calculated, this loss will not be considered for sentencing purpose.

*Benefit to the Defendant*

Special Agent Herr testified that the defendant was paid $30 to $100 for each examination that she purportedly provided. Tr. at 70, ll. 1-3. Defendant therefore received $52,860, if she was paid the minimum of $30 for each of the 1762 fraudulent claims. If she was paid $100 for each of the 1762 fraudulent claims, she received $176,200. Special Agent Herr further testified that in 2004 the defendant received a 1099 form from Rocky Mountain Health Screens (the former name of Paramed) for $49,956.39 and a 1099 from Paramed for $14,324.17. In 2005, Paramed paid the defendant $98,518.65. Tr. at 60, ll. 1-13. Paramed paid the defendant a total of $162,799.21 during 2004 and 2005.

**Conclusions of Law**

The government has established by a preponderance of the evidence that the amount of the loss attributable to the defendant is $236,297.70.

It is not seriously disputed that the defendant submitted the 1762 reimbursement claims to Paramed. By a preponderance, the evidence establishes that the defendant's NetZero e-mail account was used to send each of the reimbursement claims and her unique log-in name and password were

used to access the Paramed website to transmit the claims. Further, the evidence establishes that the defendant was paid for the reimbursement claims at issue in this case.

Nor is it disputed that Hooper Holmes had to repay ANI $100,579.00, Health Masters had to repay EMSI $120,270.15, and EMSI was unable to recover from Health Masters the additional $15,448.55 that EMSI paid to ANI.

Therefore, the critical issue before the Court is whether the 1761 reimbursement claims are fraudulent and whether they are relevant conduct for sentencing purposes. The Court holds that the evidence establishes by a preponderance that the 1761 reimbursement claims contained a number of false statements and were fraudulent.

First, the defendant lists insurance agents and insurance agent codes in the reimbursement claims, thereby falsely stating that these agents represent the applicants named in the reimbursement claims or the agents referred the applicants to her for examinations. Thus, every one of the 1762 claims is false because six of the agents do not exist or are not agents of ANI and the other two agents have never referred insurance applicants to the defendant. This alone is sufficient to establish that the defendant submitted 1762 fraudulent reimbursement claims to Paramed.

However, there are more false statements in the reimbursement claims. The defendant listed 1762 applicants in the reimbursement claims. However, ANI received no applications or examination reports for any of the 1762 applicants. Nor did the defendant produce any documents reflecting her examinations when Paramed asked for them. There is only one reasonable inference to be drawn from the absence of insurance applications, coupled with the false listing of non-existent insurance agents: The defendant did not perform the examinations as she falsely represented in the reimbursement claims.

This conclusion is buttressed by the absence of laboratory records of the specimens that the defendant purportedly obtained from applicants and submitted to CRL. CRL found no record for 253 applicants, although the defendant expressly stated in the reimbursement claims that she had sent specimens to CRL. Not one record was found despite an exhaustive and thorough search. Further, the bar code numbers used by the defendant on the reimbursement claims did not match the bar codes used by CRL or any of the other laboratories utilized by Paramed. From this evidence, the Court concludes that the defendant's reimbursement claims contained false and fraudulent laboratory and bar code information.

Finally, the results from Special Agent Herr's analysis of 120 applicants overwhelmingly supports the conclusion that the defendant did not perform the 1762 examinations and that names and other identifying information of many, if not all, of the applicants were simply fabricated by the defendant.

Contrary to the defendant's assertion, the government is not required to examine each false claim to determine if the applicants actually existed. The government has offered substantial evidence that each claim was false in listing a non-existent agent, applicant, or laboratory specimen.

The Court further holds that the 1761 fraudulent reimbursement claims are relevant conduct because the defendant submitted or caused the submission of all the fraudulent claims and the 1762 claims are part of "the same . . . common scheme or plan as the offense of conviction." Section 1B1.3(a)(2). The additional 1761 fraudulent claims are similar in all respects to the fraudulent claim in Count 1, to which the defendant pled guilty. Specifically, the claims were all submitted to Paramed in the same manner and contained the same types of false information. See United States v. Sheahan, 31 F.3d at 599, citing U.S.S.G. § 1B1.3, application note 9 ("For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one

common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.")

Further, the defendant knew that the reimbursement claims submitted to Paramed would be sent to other paramedical companies and ANI. As reflected in Government Exhibit 1, the defendant selected ANI as the insurance company and EMSI as the paramedical company to whom the claims were ultimately to be sent. Therefore, she knowingly caused the submission of fraudulent claims to the paramedical companies and ANI.

## **Conclusion**

The Court holds that the total amount of the loss, established by a preponderance of the evidence, is $236,297.70, and that the defendant is to make restitution to the following companies in the amounts specified: Hooper Holmes, $100,579.00; Health Masters, $120,270.15; and EMSI, $15,448.55.

*[signature]*

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this __20th__ day of August, 2008.